MAY A. DAVIS, Appellant, v. JOSEPH V. DAVIS et al.,
Appellees.

**DIVORCE:** Alimony—Decree Awarding Property—Not Binding on
1 Third Person Claiming Ownership. A judgment for divorce and
alimony, awarding to the plaintiff only the interest of the de-
fendant in certain corporate stock, was not an adjudication
against an intervener who claimed to be the owner of such
stock.

**DIVORCE:** Alimony—Fraudulent Transfer of Corporate Stock—
2 Sufficiency of Evidence. Evidence reviewed, and *held* that a
transfer by defendant of corporate stock to his mother was
fraudulent as to the plaintiff, and, upon attachment, was sub-
ject to her claim for alimony, as against the mother.

*Appeal from Shelby District Court.*—THOMAS ARTHUR,
Judge.

JULY 7, 1919.

REHEARING DENIED OCTOBER 22, 1919.

PLAINTIFF, in an action for divorce, caused a writ of
attachment to issue, and certain stock to be levied upon.
Defendant's mother intervened, claiming that certain of
the property levied on had been transferred to her before
any rights of the plaintiff accrued, and that she was, at the
time the action was commenced, the owner of the proper-
ty; and she asked that it be released from the attachment.
Decree for the intervener in the district court. Plaintiff
appeals.—*Reversed.*

*Cullison & Cullison,* for appellant.

*Clark, Byers & Hutchinson* and *Byers & Byers,* for
appellees.

GAYNOR, J.—The plaintiff and the defendant were mar-
ried in Avoca, Iowa, on the 7th day of September, 1904,
and lived together as husband and wife until about August,
1912. The defendant then abandoned plaintiff, and went

to live in the city of Minneapolis, with his mother, the intervener, and his sister, Ada Davis, and has lived there ever since. The evidence tends strongly to show that he did this on their urgent solicitation.

On the 13th day of February, 1913, the plaintiff filed a petition praying that she be granted a divorce from her husband, on the ground of cruel and inhuman treatment, and asking judgment for alimony in the sum of $10,000. In this action she secured a writ of attachment in due form, and the property in controversy, with other property, was duly levied upon and held under the attachment. After the levy of the attachment, and while the divorce action was still pending, on the 19th of March, 1913, May B. Davis, mother of the defendant, intervened, claiming to be the owner of certain of the property levied upon under the attachment, to wit: 10 shares of stock in the Shelby County State Bank, located at Harlan, Iowa; 20 shares of the Harlan & Avoca Telegraph & Telephone Company stock, with headquarters at Harlan, and 5 shares of the stock of the Citizens Savings Bank, at Avoca. As a basis for such claim, she alleged that, on or about the 1st of February, 1913, the defendant was indebted to her, and persons represented by her, in the full sum of $17,500; that this was then past due; and that, on or about said date, he assigned and transferred to her the aforementioned shares of the stock, in partial payment of said indebtedness, and that the same was duly transferred to her on the books of the respective corporations; that plaintiff's attachment was levied after the sale and transfer and delivery of said stock: and she prays that said stock be released from said levy, and that she be decreed to be the absolute owner of the same.

By consent of all parties, plaintiff's petition for divorce was first heard. On the 14th day of September, 1914, one year and six months after the filing of the petition, a

decree of divorce was duly granted her and entered of record, with an allowance of $10,000 alimony. The attachment was confirmed upon all the property levied on, including the property in controversy. The court, specially finding that the property so levied upon did not exceed the amount of alimony allowed, ordered that the attached property, or all the right, title, and interest of the defendant in the property so attached, be vested in plaintiff, in satisfaction of the amount allowed.

Thereafter, and on the 18th day of December, 1914, plaintiff filed her answer to the petition of intervention, in which she alleged, among other things, that, on or about February 1, 1913, the intervener, the defendant (Joseph V. Davis), and his two sisters, Ada Davis and Vinnie Duke, entered into a conspiracy, whereby it was agreed that the defendant should cease to live with this plaintiff as her husband, and should thereafter remain out of the state and beyond the jurisdiction of this court, and should convey to his mother, this intervener, all the property mentioned in said petition of intervention, and all other property owned by him within the jurisdiction of this court, to be held by said intervener, the mother, in secret trust for the use and benefit of the defendant, and for the purpose of cheating and defrauding this plaintiff out of her right to obtain or receive any part of said property for her support, or for her separate maintenance, or as alimony; that, in pursuance of said conspiracy, and with intent to defraud her, as aforesaid, the defendant, without consideration, made a pretended sale and transfer to intervener of the stock mentioned and described in the petition of intervention; and that intervener participated in said fraudulent intent, and took the property in aid of said fraudulent scheme and purpose. In her answer, she set out the decree of divorce and the judgment and decree for alimony, and asked that the rights secured to her in said

attachment and confirmed by said decree be recognized, and adjudged superior to any claim on the part of the intervener, and that intervener's petition be dismissed.

The cause was then tried, on the petition of intervener and plaintiff's answer thereto. After trial, a decree was entered, on June 16, 1915, finding the intervener entitled to the property in controversy, as against the plaintiff. Plaintiff appeals.

There is practically no dispute in the testimony. The cause is triable *de novo*. The question for us is: What does this evidence, considered as a whole, show the ultimate facts to be? What reasonable deductions or inferences should be drawn from this testimony, supporting or otherwise, the ultimate facts upon which the rights of these parties depend?

It will be noted that plaintiff has already a decree against her husband, based upon cruel and inhuman treatment, and judgment for alimony; that her suit for a divorce, based upon these grounds, was commenced on the 13th day of February, 1913; that, in the decree that followed, she was adjudged entitled, not only to a divorce and $10,000 alimony, but that the attached property be awarded her in part payment of this alimony. This decree, then, passed to the plaintiff all the rights of her husband in this property. He has not appealed, nor is he now questioning the correctness of that decree. It stands as a verity as to him. The only question for our consideration is whether or not this particular property, so awarded to the plaintiff in that decree, belonged to this intervener at that time. If it did not, then it passed, under the decree, to the plaintiff, and she is entitled to hold the same, as against this intervener. It must be conclusively presumed that the decree of divorce so founded on proof of the facts alleged as a ground for the divorce

1. DIVORCE: alimony: decree awarding property: not binding on third person claiming ownership.

has a substantial foundation in the evidence then submitted to the court, both on the question of divorce, her right to alimony, and its award.

It will be noted, however, that, prior to the granting of the decree of divorce, the intervener had filed her petition, claiming this property as against any claim by the plaintiff. It will be noted that, in the decree, the court awarded to the plaintiff only the interest of the defendant in the property, and intervener's claim was continued for further hearing. The rights of this intervener were not, therefore, foreclosed by this decree.

2. DIVORCE: alimony: fraudulent transfer of corporate stock: sufficiency of evidence.

We must assume that whatever rights the plaintiff had to a divorce, whatever rights she had to alimony, antedated the filing of her petition, and that the decree is based on the proof of the allegations of her petition. Her action was not based upon desertion, but upon cruel and inhuman treatment; and the nature of the treatment charged is such that it must have occurred some time prior to the transactions upon which the intervener bases her right to this property. It is admitted, or not questioned, that this property belonged to the defendant, and was his individual property prior to the transaction relied upon by the intervener by which she claims to have acquired it. She says, in her petition of intervention, that the defendant was indebted to her and to those she represented in the sum of $17,500; that, on or about the 1st of February, and as a partial payment upon the indebtedness so owed, defendant assigned and transferred to her the property in question.

The evidence reveals the transaction by which she acquired the interest claimed, and the motives that prompted it. The facts disclosed by the evidence are substantially as follows: In May, 1912, the defendant, who will hereafter be designated as Joe, abandoned his wife, and in Au-

gust following, went to live with his mother, the interven-
er, and his sisters, in Minneapolis, Minnesota; that he did
this on the written request of his sister, and has continued
to reside there ever since, or at least until after the divorce
in this case was granted; that, after August, 1912, he never
visited his wife, and never came within the jurisdiction of
the Iowa courts; that he withdrew, or attempted to with-
draw, all his property from the jurisdiction of the courts
of this state. About the last of January, 1913, or the 1st
of February, he was with his mother and sister in Minneap-
olis, and some talks were had between them about his
separating from his wife. It seems to have been the desire
of all that a separation be brought about,—for what rea-
son does not appear, since Joe testifies that she was always
a good wife to him, and he had never had any ground of
complaint against her. Anyway, at or about this time,
this mother and one of the sisters and the defendant got
together at Minneapolis, and after some consultation, con-
cluded that they would send the mother, the intervener,
down to see the wife at Harlan, Iowa, to the end that some-
thing might be done in the way of adjusting matters be-
tween them, and a permanent separation be brought about.
The mother came to Harlan some time after February 1,
1913. About the time she reached Harlan, she received a
letter from the sister, sent with the knowledge of the de-
fendant, warning her not to "start anything" until she
received a blank deed from Joe, and had secured his wife's
signature to the deed, conveying all her interest in the real
estate in Iowa, to wit, 281 acres in Jasper County. The
deed was received in due time, and then the mother, with
her smooth, persuasive tongue, sought to induce the wife to
sign it, and convey all her interest in this land. Failing
in this, she suggested that she could apply for a separation,
and thereafter earn her own living. This, however, was
not said to her, we take it, until after the mother had failed

to secure her signature to the deed. This land represented practically all the property that the defendant had in this state; at least, all the property of any value, except the stock that is now in controversy. The intervener, speaking of her Harlan visit, said:

"After I got transfers of this property in controversy, if May had signed the deed to the Jasper County farm, Joe would have nothing left in this state except his two-ninths interest in the Stringer property, which is not worth above $100, and his homestead. All the other property that he would then have would be outside the state of Iowa. I knew this when I was trying to get her to sign the deed to the Jasper County farm. If I had gotten my scheme through before starting anything, I would have had all Joe's property, in this state, absorbed by me and Walter, except an equity of $100 in the Stringer property. I knew that Joe wanted her to sign the deed before I came down, because I heard some talk to that effect. Ada wanted the deed to the farm signed before I *started anything*. Ada knew my business at Harlan. She knew my whole business there, and Joe knew it too. All my business down there was understood by all of us,—that is, we three, myself, Joe and Ada,—and it was understood that I was going to say something to May, and that was my business; and it was understood among us three that I was to say something. After she refused to sign the deed, I did say something. I began to talk about separate maintenance. It was Joe's wish, and it was Joe's and Walter's wish that we should get it away from her and get it into our hands."

The letter referred to, written by Ada, the sister, to the mother while the mother was at Harlan, so far as material, is as follows:

"Joe and Walter want May to sign a quitclaim deed to the Jasper County land; so don't *start anything* until Joe sends one down to her."

.Joe testifies that his mother came down at his sugges-
tion; that they had discussed the matter; that he had no
grounds for a divorce, and had no charges to make against
his wife, so the mother thought it was better for her to go
"than for me to go, with my temper. She came at her sug-
gestion and mine. I knew she was coming down. I have
not been in Harlan since May, 1912; so, when we talked
about coming down to Harlan, in February, 1913, mother
thought she could handle it better than I could; that she
could talk to May. May had always done her duty to me.
I have no charge to make against her. Mother told me to
let her go instead of me; that she could attend to it bet-
ter than I. Mother was not very well satisfied because
May didn't sign the deed for the Jasper County farm. She
was not very well satisfied with her visit to May."

The intervener testified, touching this visit:

"I think it was in February that Joe arranged with
me to come to Harlan and see May in his interest. It was
arranged some time before I started. I told her Joe was
disappointed because he didn't have children; that a baby
in the house might have a tendency to hold a man. I told
her that she and Joe didn't seem to live happily together;
that he found it something of a burden to pay the bills at
Harlan; and that he would like her to take a certain sum
each month, which was less than he had been sending
down; and it might lead eventually to a separation. I
don't know that I told her that I had come down to Har-
lan for anything in particular, but I told her that Joe
wanted me to talk with her about living separately, and
being satisfied. I didn't tell her that I had gotten this
stock. It wasn't any of her business. I didn't tell her that
we three women had taken a note from Joe each in the
sum of $3,314.42."

It appears that the property that came to this family
came through the death of a wealthy father. The interven-

er, the widow, acted, apparently, as trustee of the estate, by what authority, does not appear: we presume, by the mutual consent of the children. The children, at intervals, received money from the estate, and gave their notes to their mother, as trustee of the estate. This money was invested by the children as they saw fit, and interest was paid on the notes to the estate. At the time of the trans- actions herein complained of, "the estate," as they called it, had large investments in Minnesota, North Dakota, South Dakota, and Canada. The defendant testifies that he and his mother and sisters were the owners in common of a large amount of valuable real estate in the city of Minneap- olis; that they owned properties in Pueblo, Cripple Creek, and Colorado Springs, and, as he puts it, "all over Colora- do;" that they had bills receivable amounting to about $25,000; that, at the time intervener claims to have ac- quired this stock, he owned a one-third interest in a ranch in Kittson County, Minnesota, a half interest in 473 acres of land in Alberta County, 22 shares of stock in the First National Bank of Aberdeen, South Dakota, worth about $200 a share, a one-third interest in a $10,000 note, and a note of $1,075 against the Fullerton-Nelson Company, and was perfectly solvent; that no claim was made by the moth- er, as trustee of the estate, or in her own right, for any se- curity for any indebtedness that he owed her or the estate on any of the property outside the state of Iowa; that the property in Iowa consisted of a half interest in 281 acres of land in Jasper County, worth $125 an acre, subject to two mortgages, aggregating $27,000, the stock in controver- sy, the homestead, and a two-ninths interest in a piece of property of slight value.

It appears that, on all notes given by the children to the mother, as trustee of the estate, the interest had been promptly paid, and no interest was due from this defend- ant on any of his obligations to the estate at the time the.

pretended transfer of this stock took place; and it appears that each one had an interest in the estate, untouched, greater in value than any indebtedness held by the estate against him or her. Further than that, it appears that this defendant's indebtedness to the estate had not increased any since 1910; that, in 1910, he gave a quitclaim deed to all his interest in all the property of the estate in Minneapolis, to secure whatever indebtedness he owed the estate. This deed was given, as he testifies, to protect the estate against any loss on his indebtedness to the estate. This deed was given to secure, among other things, the very indebtedness for which these transfers in question were made. Though not good under the laws of Minnesota as a mortgage, they all thought it was good. They all understood it to be ample protection to the estate for all that he owed. This intervener did not learn to the contrary until long after these transfers were made,—not until some time in 1914. Up to that time, she thought it ample security for all that the defendant owed the estate of which she was trustee. It further appears that, ever since this pretended transfer of this stock to the intervener, Joe has received all the dividends upon the stock.

So it appears that, at the time it is claimed this settlement was made, on the last of January, 1913, or the first of February, in which it was figured up that Joe owed the mother and sisters, or the estate, $10,000, and executed his notes in equal proportion to each of them, and assigned this stock to the mother as partial payment of, or as security for, the indebtedness owed by him, the mother was holding a deed to all his interest in the property in Minneapolis which she supposed was ample security for all the indebtedness that Joe owed the estate. The manner in which he became indebted, if indebted at all, to these sisters is not fully exemplified in this record; but we may assume that he was indebted substantially as he claimed.

We must assume further that, at this time at least, they all thought they were amply secured by the quitclaim deed. Prior to the time when this transfer was made, it was talked over between these people and Joe that a separation ought to be had by him from his wife. While this discussion was going on, it seems that it occurred to them to settle the matters not in controversy, but then brought for the first time into controversy, and evidence the same by some writing. Joe, we will say, executed these notes. Joe was then perfectly solvent, so far as this record shows; and it appears that, within a few months after this transfer was made, without the use of any of the transferred property, he settled with his two sisters. He says that he didn't settle with his mother because she did not need it, and he didn't have to. The testimony of the plaintiff reveals the mind of the mother very plainly. She testifies:

"I was away from my home in Harlan at the time the intervener came. When I came home, I asked her where her grips were, and she said they were down town. We walked down to get them. On the way down, she said: 'By the way, we will step into the notary's office. I want you to sign a deed that Joe has sent down;' that Joe wanted the land transferred to Walter. I asked her if it had been sold, and she said, 'No.' Again, on Sunday morning, she laid the deed on the table, and said: 'I want you to sign this deed. I think you better think it over, and sign it.' I said I was in no hurry. I said: 'Are they selling immediately, or is it a sale?' She said, 'No;' that it would simply expedite matters; that they wanted it transferred to Walter, so that it might be more easily handled. I asked her why Joe had not written me about the deed, and she said, 'Joe doesn't write.' I told her that Joe had overlooked the matter of sending me down the $20 allowance. She answered: 'Well, May, Joe sent me down here to ask you for a legal separation,—a mutual separation. He re-

fuses to support you further, and he wants a mutual separation, and he says nothing need be made about it. He offers you $25 a month allowance for everything, to cover all your expenses for six months; and then, at the end of that time, you will be granted a divorce. You may have the house, your home, to live in, and everything that is in the house, at the end of that time. You are well, and now recovered from your operation. You are perfectly capable of looking after yourself;' that Joe thought he had no grounds for separation. I answered: 'I cannot understand why he wants a divorce, because I have done my duty, the best I knew how.' 'Well,' she said, 'Joe is in debt, and he 'cannot support a wife and stay in Minneapolis, and he refuses to pay the bills. He was going to put it in the paper, but I persuaded him not to. I want your answer. I want to take your answer back to Joe. You must consider, May. You have a business, and Joe has paid your bills, and you must always figure the interest on the investment in your home and the furniture in it while you are living there.' Then she said $25 a month would be what he would allow for my maintenance for the next six months, if I would agree to a mutual separation. She told me that Joe had been contemplating this for several weeks, and had sent her down on this errand. She said they had talked it over. She didn't say in what way. She said: 'I think it would be a good plan for you to try it, at least consent to try it for six months, and then things might turn out differently.' She presented the deed for my signature quite frequently. I told her the matter was important, and I would have no answer for her to take back. I had already refused to sign the deed, when first presented. She told me that one of her errands was to talk to me about a separation; that Joe had talked to her, and wanted her to come down before. She asked me quite a number of times to sign the deed, and told me it was not very rich

land, and she thought I would not get very much out of it."

Defendant, speaking of this transfer in question, said:

"I was perfectly willing to give my mother this savings bank stock and telephone stock to secure her. She already had the property in Minneapolis to secure her. I don't know what the Seventh Street property of seven flats is worth now. We were offered $25,000 for it, some years ago. I don't think the Vine Street property is worth $40,000, but don't know what it is worth. Minneapolis is improving very rapidly, and property is increasing in value. My mother had a quitclaim deed on both of these properties, to secure this very debt. I wanted to give this stock to her, so that she could have both for security. I have paid Vina, my sister, what I owed her. The reason I have not paid my mother is that I don't care to, and don't have to. I paid Vina in the spring of 1914. I paid Ada about March or April,—March, I think,—1913. I think it was in March, 1913, or it might have been April, that I paid them both. I got the money and paid them both about that time. At the time we made the settlement, we gathered up all the notes that E. W. Davis estate held against any of us, and canceled them. I don't know where those notes are now. At the time I sold the stock to my mother, I don't know whether it was worth $185 or $200 a share. I didn't try to sell it to anyone outside of the family."

The intervener testifies:

"We had our settlement on January 28th, at the home where we lived. Vina was then in Colorado. Ada and Joe and I represented her. I don't know what time of week it was. It might have been on Sunday or a holiday. It might have been any day, or any time of night. He made out three notes, one to me and one to Ada and one to Vina, of $3,314.42, each. I don't know whether Vina's note has been sent to her. After it was made, I have seen it in

Minneapolis. I can't tell where I last saw it. I don't know where it is now. I think it has been paid. I think he paid it in March. Ada's note I have here. Ada gave it to me. I have had it in my possession ever since this intervener's case was started. I have had it pretty nearly two years. I have had her note since I consulted my lawyer. It has been sometimes in my possession and sometimes in Ada's, and sometimes in my box; but in general, I have had charge of these papers that were involved in this case."

She further testified:

"Joe didn't offer to sell this bank stock to get the money. I didn't want that done. Joe didn't want it done either, and we were not going to let the stock leave the family, and Ada didn't take it, even though the stock contained her father's name; and, in order to fix up the deal, he sold the stock to me, and Ada holds my note for it, and I have not paid it. I have been waiting for this case to be decided. [This was said with reference to the Shelby County Bank stock.] I was going to have this bank stock kept in the family; and if Joe couldn't hold it, I would try to. That is the reason why this deal was made. At the time I took this stock, nothing was said about the Aberdeen bank stock. Joe had also an interest in the Fullerton-Baker-Nelson notes, and his interest in them would be $10,000. He had a $1,075 note, besides. It was after he had all the arrangements to have the bank stock transferred to me, and after I had tried to get her to sign her right away to the Jasper County farm, that I began to talk to her about separation, and living cheaper. I had not gotten all his property then, but I had made arrangements here in Harlan to have it transferred to me; and I knew very well that, if she had signed the deed I wanted her to, with what other property he had conveyed to me, there would be nothing left in this state belonging to him except the homestead. I have disposed of all the dividends of the Avoca

bank stock by giving it to Joe. Ada knew that my note to Joe was for the Shelby County bank stock, when she took it. She knew what it was for. She understood the transaction between me and Joe as much as I understood it, and the purpose of it, and she understood the purpose of Joe. It was understood that Joe was to have the dividends of the telephone stock. I don't know that there was any bonafide agreement, at the time, that he was to have the dividends of the stock. The debt which I claim to have taken this stock to secure is the same debt, part of it, that Joe owed in 1910, at the time he gave me the quitclaim deed to the Minneapolis property."

This, in a rough way, is the testimony as it appears in the record. From this testimony, it is apparent to us that a scheme had been entered into between the intervener, the defendant, and his sister to separate the defendant from his wife; that they recognized that, in the separation, she would be entitled to alimony; that the property in Iowa would be more readily reached by her than property situated in foreign states. To this end, the settlement was devised. To this end, the notes were given. To accomplish this end, the stock in controversy was transferred; and we have no doubt that the effort to secure a deed to the Jasper County land was in the line of the same conspiracy. As said before, the plaintiff's right to a divorce, her right to alimony, her right to appropriate this property which was within the jurisdiction of the court, to the payment of any alimony allowed her, had fully accrued before these transfers were made. Her rights were fixed. Nothing further was necessary to secure the rights to her, excepting the action of the court. It was in anticipation of this action that the transfer was made. While there is evidence to the contrary, we have serious doubts, from this record, whether the transfer of this stock, or the arrangement for the transfer, was made before the visit of the mother to

Harlan. The actual transfer of the stock upon the books, and the issuing of new stock to the mother, did not occur until after that visit. The transfer of the stock and the effort to secure the signature of the plaintiff to a deed to the Jasper County land were all one scheme,—one purpose, looking to the ultimate separation between Joe and his wife. Every act, every movement, exposed by the record, leads the mind to this conclusion. The sisters were not witnesses in this case. They knew, when the mother returned from her visit to Harlan, that she had "started something." In anticipation of this, and to protect Joe against this, these pretended transfers were made; not for the purpose of securing any indebtedness, but to protect Joe against any claim for alimony that might be urged by his wife.

We think the record justifies us in saying that there was, in fact, no legal transfer, simply a colorable transaction, to the end that some showing might be made against this plaintiff in the event that she sought to attach this property by any process through the courts of this state. The decree entered in the divorce proceedings gives to the plaintiff all the interest in this property of the defendant in this suit. We think this interest is available to her now; that the intervener has no interest in the property that a court of equity will recognize and protect. The blighting influence of fraud is the undoing of it all. The scheme was not born of any thought of protecting the mother, or the estate of which she claims to be trustee, but for the protection of Joe, if possible, against the consequences that flowed from the rightful assertion of his wife to alimony out of his property. We feel justified in saying that the trail of the serpent is over it all. We think the court was wrong in giving intervener the relief granted. Intervener's petition should have been dismissed as without equity, and the

plaintiff's right in the property confirmed, as found in the decree of divorce originally granted her.

The case is, therefore, reversed, and intervener's petition ordered dismissed.—*Reversed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.