HAZEL DAVIS, Appellee, v. C. L. DAVIS, Appellant.

No. 45246.

June 18, 1940.

Baker & Davis, G. F. Hoffman, O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellee.

L. M. Hullinger and R. B. Hawkins, for appellant.

BLISS, J.—The parties were married September 6, 1938, and lived together until June 12, 1939, at which time the plaintiff left the defendant because of his mistreatment. Each had had previous matrimonial experiences. At the time of the trial the plaintiff was 33 years old and the defendant, 41. By her first marriage in 1925, plaintiff had a daughter, and by her second marriage in 1929 she had a son. Both marriages were terminated by divorce, and she was given the custody of both children. She was twice married and twice divorced from her first husband. Defendant had three wives before he married

plaintiff. Respecting his first marriage, the defendant testified: "My marriage to my first wife, well it lasted from the courthouse in Des Moines up to the corner of Sixth and Walnut. * * * Married to get out from under a $2000 bond for seduction. * * * I never did support that child. * * * I don't know anything about the whereabouts of that child now." A daughter, Betty June, was born of his second marriage. The mother obtained a divorce and custody of the child. He testified: "I never paid no direct alimony. * * * After I was divorced from (the second wife) I had some dealings with my first wife. I was around her some. I did not remarry her." His third wife procured a divorce from him and so far as the record discloses, he again escaped alimony.

Plaintiff was living with her parents, and defendant and his mother were living on an 80-acre farm. The mother moved to town in a few days and plaintiff then went to the farm, taking with her four head of cows, chickens, some household furniture, and canned fruit and vegetables. She took her 9-year-old boy with her but left the daughter with her parents. There was no discord during the first two weeks but from then on defendant became abusive and surly. Before their marriage he had told her the farm was his and afterwards showed her a deed of the farm from his mother to him, which bore date of December 9, 1933. He told her he would record it if his mother could not get a pension without it. The mother returned to the farm some time in May 1939, and there was further discord. On June 11, 1939, which was Sunday, the plaintiff attended homecoming services at her church. Her husband did not accompany her. After the exercises at the church she went to her parents home and picked two large buckets of strawberries. About 10 o'clock that night her father, who lived four or five miles from her home, took her in his automobile to within a half mile of her home, and she carried the strawberries the rest of the way. Her husband had retired, but according to her testimony he began cursing her, and upbraided her with the remark that "it was a fine time for a married woman to be rolling in." On retiring he continued

his abusive remarks and struck her several times on her head, shoulders and arms and abdomen. She was then about three months in pregnancy. She left the bed and went to the kitchen where she became sick and fell to the floor. The defendant and his mother each testified that they heard her fall but that they knew she fell intentionally and was pretending to be sick. Later the defendant came out and threw the strawberries out the door, and continued his abusive language but gave her no aid. He admits throwing the strawberries out, and told her that he could support her without aid from her parents. The next morning the plaintiff went to a neighbor and telephoned her father to come for her. Her petition for divorce, alleging cruel and inhuman treatment, was filed two days later. The defendant admitted some of the circumstances of the night of June 11th, but denied striking her, and said he simply threw her away from him in resisting her amorous advances. Further detail of the evidence relative to grounds of divorce would serve no purpose. The questions are very largely those of fact. Counsel for appellee has referred to both the "plain and fancy" mendacity of the defendant. The trial court, in a memorandum opinion, remarked that:

"Up until the time the defendant got upon the witness stand the Court wasn't very much impressed with the evidence of the plaintiff as to her right to maintain this action and obtain a divorce, but the longer the defendant testified in this trial, the more the court became impressed with the thought that the defendant was not being fair to the court and wasn't being truthful regarding many of the things that were in controversy here * * *."

The court rendered decree for plaintiff, granting her prayer for divorce, the custody of her child when born, $200 for suit money and temporary alimony, $400 for permanent alimony for plaintiff, and $20 a month for the child upon its birth. Judgment was entered for these amounts. It was the further order, judgment and decree of the court that the defendant was the owner of the 80-acre farm herein referred to,

768

being the northeast quarter of the northeast quarter of section nineteen, and the northwest quarter of the northwest quarter of section twenty, township sixty-seven, range twenty-seven in Decatur county, Iowa, and that the above-stated amounts were a lien upon said real estate.

I. The statutory provision as to corroboration in divorce actions is all embodied in Code section 10474, which states simply that: ''No divorce shall be granted on the testimony of the plaintiff alone.'' The main reason for the requirement of corroboration has been and is for the prevention of collusion between the parties. The corroboration of the plaintiff may be by either direct or circumstantial evidence, tending to establish the grounds alleged. It is not essential that it alone sustain the decree, or that it support the plaintiff's testimony at all points or in all of its parts. Such a strict requirement might oftentimes frustrate justice owing to the privacy of domestic relations. Leonard v. Leonard, 174 Iowa 734, 738, 156 N. W. 803, 805; Courtney v. Courtney, 214 Iowa 721, 724, 243 N. W. 510, 512; Hines v. Hines, 192 Iowa 569, 570, 185 N. W. 91, 92. See generally on the subject, Tuttle v. Tuttle, 21 N. D. 503, 131 N. W. 460, Ann. Cas. 1913B, 1; 17 Am. Jur., section 384; 65 A. L. R. 165 et seq. There is no claim or basis for the charge of collusion or connivance in this case.

In division I of his brief, appellant complains that the appellee was not entitled to a decree of divorce ''for the reason that the material evidence wholly lacked corroboration and failed to show that any impairment of health was caused by the alleged cruelty.'' Before the taking of testimony this stipulation was made, towit: ''It is agreed between the parties hereto that all of the evidence that is to be offered and introduced upon the trial of this case is to be taken and received by the Court subject to any and all objections of every kind, nature and character known to the law, including the competency of witnesses, and the competency of any documentary evidence offered. The object and purpose of the agreement being that of saving the time required to make the objections when the testimony is offered.''  .

We have serious doubts whether the method employed is a timesaver. But if it is, the prodecure is not to be recommended either for the purposes of trial or of appeal.

There was sufficient proper testimony, including corroboration, to sustain the allegations of the petition relative to plaintiff's right to the divorce, the custody of the child, and the alimony.

II. In division II appellant complains that since Ida Davis, the mother of the appellant, was not a party to the suit, and the petition raised no question as to the title to the 80 acres, the court had no jurisdiction to place a lien thereon to secure payment of the judgment. Before discussing this question some other parts of the record should be stated. The father of the appellant had sold this land and taken back a mortgage or trust deed. He died intestate leaving the appellant, his brother and their mother, as his widow. The purchaser could not make the payments and conveyed the land to the mother. The two sons assigned their interest in the land to the mother so that it might be recorded in her name.

She had a tract of land in Missouri which she conveyed to the appellant's brother. There was no administration on the estate of the father. The appellant paid the funeral expenses, and his obligations, including a note at a Lamoni bank, and taxes. Appellant and his mother moved on this farm in January 1933. In December 1933 two deeds were executed and acknowledged by the mother. One was a warranty deed conveying this 80 acres to the appellant. The other deed conveyed him a life interest and the remainder to his daughter Betty June Davis. At the trial the appellant and his mother claimed that these deeds had never been delivered. Neither of them had been recorded. They were executed during the time he was living with his third wife. However, documentary evidence and other testimony was introduced directly refuting this testimony. The file of the Old-Age Assistance Commission of Decatur county was introduced in evidence, with the consent, in open court, of appellant's counsel. In this file was a copy

of the application of appellant's mother, dated November 2, 1938, asking for old-age assistance, and stating that she owned no real estate. There was also a written statement of the appellant, dated November 3, 1938, in support of his mother's application, stating that he was a farm owner, having an equity in the farm worth $3,000, with 35 acres in cultivation, and 22 acres in pasture, and personal property of the value of about $785. Appellant also took his straight warranty deed to the farm to this division of old-age assistance, so that a copy might be made for the files of the division. This copy was introduced in evidence as well as the original deed. A. J. Ehrhardt was the investigator in charge of the division at Leon. On November 19, 1938, appellant wrote to Ehrhardt that he had been told that Ehrhardt desired him to turn in his questionnaire relative to his mother's pension, and he desired to inform him that he had done this on November 5th, and that the papers must be on file in his office. When Ehrhardt looked up the title to this land, he found it was of record in the name of appellant's mother, and he wrote to appellant about it. In reply, the appellant, on January 31, 1939, wrote the following letter to Ehrhardt:

"Dear Sir: In reply to your letter on reverse side, I bought this place and paid for it long before the old age assistance was even thought of and the deed was made at that time. I have a family of my own to take care of and that is about all that I can take care of. I would like to see my mother get the help that is coming to her, but I am not going to give a lien on this farm. I have a good reason for not recording my deed that I am willing to tell you but I am not going to put it in writing. If you want to know the reason give me an appointment and I will give you the information. Yours truly, C. L. Davis."

The trial court apparently had this file before him while the appellant was testifying that the land belonged to his mother, and was not his and that the deeds had never been delivered to him, for this colloquy took place:

"The Court: While he is on the stand: What do you claim about this eighty acres of land? I don't understand what anybody is claiming about it. Do you claim to own it or don't own it. Mr. Hawkins: We claim it is in the legal and equitable title of the mother, always has been, and never has been transferred to this boy.

"The Court: What do you claim about these deeds, they were delivered or— Mr. Hawkins: Weren't delivered. They were not delivered.

"The Court: Then what do you claim about these applications to this Old Age Assistance? Somebody is in difficulty here over that now. With the Old Age Assistance you are making an affidavit there you don't own any property of any kind, and this man on the stand claims he owns the land in the application to the Old Age Assistance. Now, the Court wants to know the truth about these matters. You either own this land or don't own it. Mr. Hawkins: Your Honor, I haven't looked at those."

After the appellant persisted further in his denials of ownership, the colloquy proceeded further:

"The Court: I think, Mr. Hawkins, you ought to look these papers over and consult with your client before you have him swear the way he is, because somebody is going to get in deep water over this thing. I will give you a little recess. You look these things over, look these deeds over. Somebody is in deep water over this situation now. Mr. Hawkins: I haven't looked that over.

"The Court: All right, look them over and look these deeds over and the Court will give you a little recess."

After the recess the appellant admitted the authenticity of the writings in the file, but claimed that the statements therein respecting the land were untrue and sought to show that it was all a scheme on the part of Ehrhardt to obtain the pension in this fraudulent manner. Appellant testified:

"I was led and induced by Mr. Ehrhardt that this was the proper way to procure a pension for my mother. He just told me, he says that, 'If you can make the Commission think that the place is yours,' why, he says 'She will get the pension.' He says, 'Otherwise she won't.' "

"Q. You furnished him with a copy of these deeds, did you? A. One of them. Mother did.

"Q. I notice you make a statement in there you paid for it years ago. What payments did you make? A. That is what Ehrhardt told me, to make them think that the place was mine."

In view of the entire record, it is not surprising that the trial court placed little credence in the testimony of the appellant. Mr. Ehrhardt, as a witness, denied all of this testimony, and testified that the appellant and his mother executed the papers referred to voluntarily, and without any suggestion of fraud or subornation on his part.

In her petition the appellee alleged "that as the plaintiff is informed and believes, the defendant possesses real estate worth not less than $4000 after deducting all incumbrances, * * *".

She prayed for temporary and permanent alimony out of his property and for general equitable relief. The appellant, in his answer, denied these allegations. Evidence was offered by each party in support of his respective allegations. The court had jurisdiction of the parties and the subject matter including the property of the parties. The issue was fully submitted. The mother of appellant was not a necessary party. She was a witness for the appellant and knew of the claim of the appellee that the 80 acres belonged to appellant, and that she was asking alimony and child support out of appellant's property, including this land.

Whether the mother could have intervened and set up her claim to the property, or whether the appellee could have brought her into the suit to have the question of ownership determined, are questions which are not before us and we do

not pass upon them. See however, Davis v. Davis, 187 Iowa 407, 173 N. W. 7.

Code section 10481 provides that:

"When a divorce is decreed, the court may make such order in relation to_ the children, *property*, parties, and the maintenance of the parties as shall be right." (Italics ours.)

Under this section and under our decisions the court had complete jurisdiction to settle the property rights of the parties and to award full relief respecting the property. In the exercise of that jurisdiction the court had the power to decree that the awards for alimony and child support should be a lien on any real estate which the appellant owned. The fact that judgment was entered for the awards would in itself make them liens upon any real estate owned by him. See Millisack v. O'Brien, 223 Iowa 752, 273 N. W. 875; Luedecke v. Luedecke, 195 Iowa 507, 192 N. W. 515; Baird v. Connell, 121 Iowa 278, 96 N. W. 863. Appellant complains that the petition did not specifically describe this particular property. This failure does not aid him. Twing v. O'Meara, 59 Iowa 326, 13 N. W. 321.

The decree in this case, as between the parties to the suit, determined their respective rights in this land. If it does not belong to the appellant, the lien of the judgment may never aid the appellee, but, neither can it, in that case, possibly harm the appellant, and he is not aggrieved. In Davis v. Davis, supra, 187 Iowa 407, 173 N. W. 7, the plaintiff sued for divorce and alimony and attached certain shares of stock, which the defendant had previously transferred to his mother. The latter intervened and claimed the stock as hers. The court first tried the divorce action proper and granted the plaintiff a decree of divorce and awarded plaintiff alimony out of the stock. The intervention action was then tried and the property was awarded to the intervenor. This last decree was reversed as wrong under the facts. Respecting the alimony judgment in the divorce action, the court on page 410 of 187 Iowa, page 8 of 173 N. W., said: "This decree, then, passed to the plaintiff all the rights of her husband in this property." So, in the

case at bar, the judgment and decree gave appellee a judgment lien on whatever interest the appellant has in this land. There is substantial evidence to sustain the trial court's findings and conclusion in this respect.

What rights, if any, the mother of the appellant may have in this land, or the effect of the court's decree on such rights, or what, if any, redress she may have, are all questions which are not before this court for determination, and we do not determine any of them. On this appeal of the defendant it is our judgment that the trial court was right and that its judgment and decree should be affirmed. The fact questions are controlling. While we have tried the case anew, and we are not bound by the findings or conclusions of the trial court, we are mindful of the fact that that court occupies a position of vantage where there are conflicts in the testimony, and the credibility of witnesses is an issue. In reviewing such a decree we give serious consideration and weight to these findings and conclusions.. Massie v. Massie, 202 Iowa 1311, 1312, 210 N. W. 431, 432; Blew v. Blew, 225 Iowa 832, 835, 282 N. W. 361, 362; Kingery v. Kingery, (Iowa), 275 N. W. 561; Panama Sav. Bank v. Arkfeld, 228 Iowa 313, 291 N. W. 182, 184. From applications which have been made to this court since the appeal, we are informed that a child was born to the appellee and is in her custody and care. Appellant's motion to strike appellee's second amendment to the abstract, filed May 2, 1940, is denied.

The appellant had the transcript certified to us, and we find the matters set out in the amendment were correctly stated. It is our judgment that the judgment and decree appealed from should be, and it is hereby, affirmed.—Affirmed.

HAMILTON, C. J., and SAGER, OLIVER, MILLER, STIGER, RICHARDS, and MITCHELL, JJ., concur.