W. A. LITTLETON, Appellee, v. MABLE LITTLETON, Appellant.

. No. 46264.

JUNE 15, 1943.

REHEARING DENIED SEPTEMBER 27, 1943.

O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, all of Osceola, for appellant.

G. C. Stuart, of Chariton, for appellee.

BLISS, J.—Plaintiff and defendant, of the ages of fifty-four and fifty-three years respectively at the time of the trial, were married January 31, 1937, and lived together until October 2, 1940. On the latter date the plaintiff left their home

and never thereafter lived with the defendant. For thirty-five years he had been in the employ of the Burlington Railroad Company as telegraph operator and station agent. He was so employed at Chariton, Iowa, during the married life of the parties. He had experienced two previous matrimonial ventures, each terminated by a divorce procured by the wife. The first ended after nineteen years of matrimony, and the second, before the close of the first year. One son is living as the issue of the first marriage. The defendant's first connubial voyage also ended in the divorce court, nineteen years after they set sail, on the petition of the plaintiff. No children blessed this union. She then became a practical nurse, which profession she was following when the marriage in controversy was consummated.

When the plaintiff separated from the defendant he took with him only his clothes, and left his wife in possession of their rented apartment, where she continued to live for several months, when she returned to her own home in Pella. This home she acquired in the dissolution of her first marriage. The plaintiff has been living with his mother since leaving the defendant.

Plaintiff filed his petition on October 24, 1940, praying an absolute divorce on the grounds of cruel and inhuman treatment, seriously affecting his health and endangering his life. The defendant filed answer denying generally, and a cross-petition asking separate maintenance. By agreement the plaintiff paid defendant $45 a month pending trial.

The trial was conducted most efficiently before an able judge. It would serve no purpose, either to the profession or to the public, to detail with any particularity the evidence produced. While it had some variations, it followed a pattern very familiar to the bench and the bar. The plaintiff called but one witness, a lady thirty-five years old, who worked in the home about a year. The defendant's sister and a doctor testified for her. If the plaintiff is to be believed, the defendant is a woman of violent temper and ugly disposition, with a vicious tongue and a strong arm, who began a course of nagging, faultfinding, cursing, and abuse a month after their marriage, which continued with little interruption, both day and night,

while he was in her presence, until he could stand it no longer and ran from the home on October 2, 1940. In order to get some rest he would leave their bed and go to the davenport. On one such occasion she followed him there and accompanied her tirade with a good pummeling. She burdened him considerably with her relatives. Of this, the plaintiff concedes he made little complaint and that he consented thereto. An aunt of the defendant's was with them for two or three periods of some length. She was eighty-one years old. A sister of the defendant, almost eighty years old, was with them over a year and died in their home. Another sister, living at Pella, widowed shortly before, was frequently in their home. After being in a Des Moines hospital because of a broken leg, she came from Des Moines, where her married son maintained a home, to convalesce for five weeks in the home of the parties hereto. The other sister was also in the home at the same time. All of this added substantially to the expense of the home and was not conducive to harmony. The plaintiff worked seven days each week from eight o'clock a. m. to four o'clock p. m. each day. His monthly pay was somewhat in excess of $200, but he was unable to meet his current obligations. He complained of his wife's lack of economy, but, though promising to, she failed to regard his admonitions. He gave her weekly cash allowances for groceries, but she charged most of them, and even had checks cashed at one grocery store. He testified that in her weekly or biweekly trips to her sister's home at Pella she carried many groceries in the back of the car, which he paid for. His witness corroborated him in this, and in much that we have already stated. This witness testified of the defendant:

"She had a terrible temper. * * * I have seen her race through the rooms like a wild person. I would be scared to meet her. I was afraid of her. Everybody was afraid of her. She would curse. I have seen her take her hand back and then decide not to strike. She would be just raving. It was almost a daily occurrence. Mr. Littleton didn't have much to say, if anything. She was very nice when strangers would come in, or anybody from Pella. As soon as they left we all caught it if we had said something that she thought we shouldn't say.

I have seen her old invalid sister cry. She was scared of her. The old sister told me the only time we had any freedom was when we were by ourselves—but she was never herself when Mrs. Littleton was around. I know of food and groceries being taken to Pella. I helped pack the groceries. I have known of chicken, eggs, butter and canned stuff on more than one occasion. I helped to put it in the car Mrs. Littleton drove. She was going to Pella. That has happened lots of times."

The plaintiff testified that the defendant falsely accused him many times of infidelity—of sexual intercourse with her old aunt, with the hired girl, with a neighbor lady, and of undue familiarity with a Pella lady. Her answer to these charges on the witness stand was a categorical, "I did not," or a mere "No, sir," without qualification. When her sister died the defendant, as the beneficiary in two policies in which the sister was the insured, received over $1,600, which she deposited in a Chariton bank. The record shows that the plaintiff received little benefit from this money.

There was much other testimony supporting his alleged grounds for divorce. The record fairly sustains his claim that her deliberate and persistent mistreatment not only greatly interfered with his work but undermined his health and seriously injured his physical and mental condition. He was entitled to his divorce.

With respect to the alimony the award appears to be fair, considering the financial condition of the parties. The court awarded her the household goods, $35 a month for three years, $150 for attorney's fees, and the payment of a number of her bills about town. The plaintiff owes over $3,000 and has no property. The defendant owns a home in Pella, worth $2,000 or more, subject to a $1,200 mortgage. While her doctor testified that liver and gall bladder trouble incapacitated her at the time of the trial from working, the evidence shows that she did much physical labor, cared for her invalid sister, and was able to make weekly automobile trips to Pella—forty miles each way—and did the laundry of her sister living at Pella. In support of her cross-petition for separate maintenance she offers no evidence of mistreatment other than his refusal

to live with her. The trial judge heard and saw the parties and their witnesses. This advantage enabled him to judge more fairly and accurately of their credibility and the probative value of their testimony than this court can. We fully agree with his conclusions of law and fact. We have many times held that much weight should be given to the findings of the trial court in cases of this kind. See Pooley v. Pooley, 178 Iowa 19, 21, 157 N. W. 129; Lewis v. Lewis, 197 Iowa 703, 704, 197 N. W. 907; Massie v. Massie, 202 Iowa 1311, 1312, 210 N. W. 431; Blew v. Blew, 225 Iowa 832, 282 N. W. 361; Kingery v. Kingery, Iowa, 275 N. W. 561; Votaw v. Votaw, Iowa, 6 N. W. 2d 1.

Defendant complains that the corroboration was insufficient because the witness had not been in the home for a year or more before the separation. It is not necessary that the corroboration support the complainant throughout the course of the mistreatment or as to every detail of his testimony. The testimony of this witness corroborated the plaintiff very fully as to the unrelenting nagging, cursing, and abusing by the defendant for eleven months. She testified that he failed in health. In Davis v. Davis, 228 Iowa 764, 768, 292 N. W. 804, 805, we said:

"The main reason for the requirement of corroboration has been and is for the prevention of collusion between the parties. * * * It is not essential that it alone sustain the decree, or that it support the plaintiff's testimony at all points or in all of its parts. Such a strict requirement might oftentimes frustrate justice owing to the privacy of domestic relations." (Citing cases.)

Certainly there was no collusion in this case. The corroboration fulfilled the requirement of Code section 10474.

Mistreatment of the kind indicated by the record, which deprives a person of needed rest and peace of mind, may so affect his nervous system and bodily functions as to undermine his health and thereby endanger his life as effectively as blows or bodily abuse, whether the victim be a man or a woman. Precedent is of little value in the determination of cases of this character, because in each case the factual situation is

different. It is conceded that the plaintiff became very nervous, afflicted with headaches, and lost much weight. Defendant attributes this to infected teeth. He left the home before the extraction of his teeth or his dental work was completed, and yet he improved in health and began to gain weight shortly after he left the defendant and while partaking only of a liquid diet.

We find no abuse of discretion in the trial court and no reasons justifying a reversal. The decree is affirmed.—Affirmed.

GARFIELD, C. J., and HALE, MILLER, OLIVER, SMITH, MANTZ, and MULRONEY, JJ., concur.

WENNERSTRUM, J., takes no part.