GLADYS M. ERNEST, appellee, v. ALVIN L. ERNEST, appellant.

No. 48155.

(Reported in 55 N.W.2d 192)

OCTOBER 14, 1952.

Hallagan & Lucier, of Des Moines, for appellant.

Johnston, Shinn & Johnston and Johnson & Johnson, all of Knoxville, for appellee.

WENNERSTRUM, J.—Plaintiff seeks a divorce from the defendant and in her petition alleged acts of cruel and inhuman treatment that endangered her life. She also asks that an equitable property settlement be made between the plaintiff and the defendant and that such settlement should include the restoration to her of all money or property obtained from her

by the defendant including the title to the interest in real estate which she had conveyed to him. The trial court granted a divorce to the plaintiff and the defendant has appealed.

The court in its findings held that although the record failed to show any physical violence toward the plaintiff by the defendant there was adequate and sufficient evidence to justify it in holding that the acts of the defendant were of such a nature as to bring on nervousness, mental depression and high blood pressure. In addition to granting the plaintiff a divorce the trial court entered judgment for attorney fees in favor of plaintiff's attorney and ordered that the deed wherein the plaintiff conveyed a joint interest to the defendant in a farm be set aside and that she be granted full and complete title to it. It also held that the interest in government bonds and savings accounts which had been put in the joint names of the plaintiff and defendant be restored exclusively to the plaintiff. The defendant in this appeal claims that there was a complete lack of good faith by the plaintiff in filing her petition, that the basis upon which the plaintiff's action was founded was not substantiated other than being based upon opinion evidence and that there was an insufficient showing to establish cruel and inhuman treatment which endangered the life of the plaintiff and which would entitle her to a divorce.

The plaintiff at the time of the trial was approximately sixty years of age. She had lived in Knoxville for about twenty-five years. Her first husband was Charles Yarnell, a retail hardware merchant in Knoxville. They had been married twenty-one years at the time of his death which occurred on August 6, 1949. No children had been born to them. Her first husband had retired from his business operations in 1941. Mr. Yarnell died possessed of a home and three small rental houses in Knoxville, a half interest in a hardware store and also an apartment building in that city. He also possessed a 160-acre farm in Marion County and a certain amount of cash and bonds. The farm property had been held by the Yarnells in joint tenancy and the plaintiff became the owner upon Mr. Yarnell's death. Mrs. Yarnell was given a life estate in the remaining real estate.

During the years from 1940 until the time of Mr. Yarnell's

death in 1949 he and the plaintiff spent a portion of several winters in Long Beach, California. During these visits they became acquainted with the defendant, who was manager of the hotel where they stayed. Mr. Ernest's mother also lived at the hotel although she was employed elsewhere. The Yarnells, during their sojourn in California, and Ernest and his mother frequently had dinner together and took automobile trips on week ends. The last time they were all together prior to Mr. Yarnell's death was in February or March in 1949. Following his death in August 1949 Mrs. Yarnell went to Long Beach, California, by train in December of that year. On the invitation of the defendant and his mother she went to a home that they had then established and stayed with them until on or about March 12, 1950. At that time the defendant was a beer salesman and was earning $400 a month and was supporting his mother. During the period from December 1949 to March 1950, when the plaintiff was in California, she and the defendant's mother discussed her possible marriage to Ernest. It may be presumed that he and Mrs. Yarnell also discussed these plans, but there was no definite arrangement made about marriage at that time by them. On or about May 4, 1950, the defendant and his mother came to Knoxville where they stayed for about two weeks. During the time that the defendant was in Iowa he asked to see a copy of Mr. Yarnell's will and in company with the plaintiff went to one of the banks in Knoxville and made a list of the contents of her safe-deposit box.

On May 16 (1950) the plaintiff and the defendant left Knoxville for California in plaintiff's car. It was their plan to be married at Las Vegas, Nevada, in which state there apparently is no waiting period requirement or necessity for blood tests. The day before they left plaintiff and defendant went to the bank and got the deed to the farm. On this later date there was $6000 in government bonds in the bank box. Apparently they left instructions to mail these on a later date to the plaintiff at the address of the defendant in Long Beach. En route to the west coast the plaintiff, defendant and defendant's mother stopped in Kansas City to visit the plaintiff's sister who suggested that they could be married in Arkansas without any delay.

From Kansas City they drove to Bentonville, Arkansas, where they were married on May 17, 1950. They arrived in Long Beach on or about May 20.

The record discloses that prior to the marriage it was suggested by the defendant that it would be advisable for plaintiff to have the farm property placed in joint tenancy. Shortly after they reached Long Beach the defendant took the deed to an attorney and within a short time thereafter the attorney called the plaintiff and she and the defendant's mother went to the attorney's office where the plaintiff executed a deed whereby the farm property was held in joint tenancy by both of them. It was further shown that at the suggestion of the defendant the plaintiff wrote letters to both of the Knoxville banks in which she had accounts directing that the defendant's name be added to the account. It would appear that the defendant advised his wife that he would take care of the money and that she was hesitant to write any checks. It would also appear that she wrote no checks on either of the accounts in the Knoxville banks until after she left the defendant on November 2, 1950. It should be stated, however, that the defendant added the plaintiff's name and that of his mother to his account in a Long Beach bank. However, the plaintiff was not given a checkbook which would enable her to write checks on this account. It is shown that at the defendant's suggestions the bonds were changed and new bonds were issued with both of them named as payees. These new bonds were put in defendant's bank box in a Long Beach bank.

The defendant's home in or near Long Beach was sold, along with its furnishings, in August 1950 and the defendant and his wife and defendant's mother then returned to Knoxville. Shortly after returning to Knoxville the plaintiff, defendant and his mother went to Michigan and bought a new Dodge car and a house trailer. The new car was registered in defendant's name and may have been paid for with his own funds. The trailer was registered in the defendant's name and checks in the total amount of $2895.52 were written by him on a Knoxville bank account of his wife in payment thereof. There is no showing that any of the defendant's money had gone into the purchase

of the trailer. After the purchase of the car and trailer in September 1950 the plaintiff and defendant, along with the defendant's mother, went to Knoxville where they stayed approximately a month and then went to Palm Springs, California. After they had been in Palm Springs less than a week the plaintiff left the defendant on November 2, 1950, and came back to Iowa, and she did not see him again until the time of the trial in October 1951. The record shows that at that time the defendant was fifty-four years of age.

There has been an extensive record presented to us, a portion of which has been heretofore summarized. There is evidence that the plaintiff was affected by the domination of the defendant over her in connection with both her financial and her social activities and, under the circumstances, she was unable to have much, if any, control over her finances. It was apparent that the defendant's mother was with the plaintiff and defendant almost all the time. There is considerable evidence that the defendant and his mother were not refined in their language and conduct and told stories of a lewd and salacious character that were embarrassing to the plaintiff. Objections were made to portions of the testimony so describing the stories and actions of the defendant and his mother. It is claimed that the statements of the witnesses were mere conclusions. Fortunately the record does not disclose the stories told, but there is sufficient corroborated testimony showing the nature of some of them and also the conduct of the defendant and his mother. The defendant, as a witness in his own behalf, admitted that some of the stories told in the presence of guests "might border on the risque."

There was testimony presented by a physician in Knoxville who had attended the plaintiff prior to her marriage to the defendant and who observed and treated the plaintiff after she had left the defendant at Long Beach, California, and returned to Knoxville. This doctor testified that when the plaintiff and defendant returned to Knoxville about May 15 or 16 (1950) her physical condition and mental attitude seemed to be normal. On a later occasion in September and October the physician further examined the plaintiff and he testified that at that time the plaintiff seemed to be in a state of depression and that she

seemed to have changed and "didn't talk much." He further testified that he did not talk to her privately as both the defendant and his mother were present at the time of his examination. On a later occasion following the plaintiff's return to Knoxville and after her separation from her husband she was again under his care and observation, and he states that at that time she had developed a further nervous condition. He testified that she seemed to be "nervous and jerky" and that he had her remain at the hospital as a bed patient for three or four days. On subsequent occasions he observed and examined the plaintiff, and concerning these times he states she seemed to be more like she formerly had been. He further stated that she seemed to have recovered from the depressed state she had been in when he saw her in September and October of 1950.

After the plaintiff left the defendant and his mother at Palm Springs and during her return trip to Knoxville she wrote endearing letters to the defendant. These letters have been certified to us and they show the plaintiff's deep interest and a love for the defendant. They can also be construed as indicating her unsettled state of mind. No letters were written after her return. From a review of the entire record we are satisfied that the plaintiff has made out a case of cruel and inhuman treatment that affected her health and endangered her life and that the trial court was correct in holding that the plaintiff was entitled to the relief which she sought.

I. It is apparent to us that the defendant followed a course of domination over the plaintiff commencing before their marriage and continuing until the time she left him. The fact that the defendant sought and did effectively control the financial affairs of the plaintiff is evidenced by his statement after she had asked for a little spending money. He replied, "If that is the way you feel we will call it off right now and I will give you back your bonds and your farm." This statement is not denied by the defendant. As a witness at the time of the trial he evidenced a different attitude and stated that he was then unwilling to deed the farm property back to the plaintiff. Physical violence is not necessary to constitute cruel and inhuman treatment. Acts and conduct that affect the nervous system and in-

1256

directly the physical well-being of an individual can and frequently do constitute cruel and inhuman treatment. Dillavou v. Dillavou, 235 Iowa 634, 637, 17 N.W.2d 393, and cases cited; Neff v. Neff, 237 Iowa 69, 71, 20 N.W.2d 916; Doyle v. Doyle, 241 Iowa 1185, 1187, 1188; 44 N.W.2d 761, and cases cited; Levis v. Levis, 243 Iowa 574, 580, 52 N.W.2d 509, 512.

II. We feel justified in giving consideration to the fact that the defendant was disposed to tell "off color" stories in the presence of guests that were embarrassing to the plaintiff and affected her nervous system and her health. We held in Levis v. Levis, supra, that unfounded charges of infidelity constituted inhuman treatment and that such conduct has been held capable of endangering the life of the accused. We also have held that the use of profanity by a husband in the presence of others, along with other shown facts, constitute cruel and inhuman treatment that affected a complainant's health. Dillavou v. Dillavou, supra. It is our conclusion that the telling of lewd and salacious stories in the presence of guests can injuriously affect the health of a person of refinement and can cause mental anguish. The plaintiff is shown to be a person of such refinement. See 27 C. J. S., Divorce, section 28(a), page 551, section 28(d), page 559.

In addition to the facts heretofore set forth the record shows most indecent conduct and language indulged in between the defendant and his mother in the presence of the plaintiff, which could not fail to affect seriously a wife of even ordinary sensibilities. There is also a recital of a vile name called plaintiff by defendant's mother in his presence, which he did not challenge, but by his conduct seemed to approve, or at least condone. No good purpose would be served by a verbatim recital of these obscene words and actions, but it should be pointed out that they are in the record and add greatly to plaintiff's case.

Some of these matters last referred to are not corroborated. However, they form a part of the general pattern of conduct of defendant and his mother toward plaintiff. We have often held that every detail of plaintiff's case showing such cruel and inhuman treatment as to endanger life and health need not be corroborated. Brannen v. Brannen, 237 Iowa 188, 21

N.W.2d 459; Littleton v. Littleton, 233 Iowa 1020, 10 N.W.2d 57; Davis v. Davis, 228 Iowa 764, 292 N.W. 804.

III. We hold that there is sufficient corroborated testimony that substantiated plaintiff's charges. Under all the circumstances disclosed by the record we are abidingly of the opinion that the trial court was justified in entering the decree it did. We consequently affirm.—Affirmed.

All JUSTICES concur except HAYS, J., who takes no part.