LORENE M. BROWN, appellee, v. RAYMOND L. BROWN, appellant.

No. 49144.

(Reported in 82 N.W.2d 661)

MAY 7, 1957.

Burnquist, Helsell & Burnquist, of Fort Dodge, for appellant.

Rider, Bastian & Beisser, of Fort Dodge, for appellee.

PETERSON, J.—Plaintiff seeks divorce from defendant on the ground as alleged in her petition of "such cruel and inhuman treatment as to endanger the life and health of plaintiff and that she is in fear of injury at defendant's hands." There are no children. There is no controversy as to property division nor alimony, the court having made an equitable division of property, and allowing no alimony. Defendant filed a cross-petition for divorce, but dismissed it before trial. The trial court granted a divorce to plaintiff, and defendant has appealed.

The court in its findings as to the facts held that although there was no evidence of physical violence toward plaintiff by defendant, there was sufficient evidence to justify the court in holding the acts of defendant were of such nature as to cause plaintiff to be extremely nervous and sick, and in view of plaintiff being afflicted with a severe case of tuberculosis, defendant's actions did endanger her life.

The parties in their youth lived in the small town of Dayton, Iowa. They met in 1939 when plaintiff was 19 years of age and defendant was 20 years of age. They started to keep regular company with each other in 1940. Some months thereafter defendant enlisted in the Army. In the fall of 1942 he was stationed at Lawton, Oklahoma. By arrangement plaintiff traveled to Lawton and they were married there on October 10, 1942. They started housekeeping near the camp in Lawton and continued this program after he was transferred to a camp in Colorado. Early in 1943 he was sent overseas and plaintiff came back to her home town. Both parties were thrifty. She lived on the allotment of $50 per month which was sent to her by the government. He saved money from his government pay and sent

it back to plaintiff and she deposited it all in the bank. Defendant was discharged in November 1945. Shortly thereafter they purchased a modest home for which they paid $1500. With the money she had saved, and proceeds of a lot sold from the home purchase area, they paid for the home in full. Plaintiff had indications of tuberculosis as early as 1940, but she improved and was apparently well at the time of marriage and some years thereafter. However, during the three years they lived together, after defendant returned from service, her tuberculosis developed to an acute stage. It became so severe that on June 5, 1948, the doctor sent her to the tuberculosis sanatorium at Oakdale, Iowa. There was apparently a family tendency toward tuberculosis because her sister was also in the sanatorium for a part of the time she was there. By 1951 she had improved to the extent that she was able to devote one half of her time to work in the sanatorium. In July of 1952 she was discharged as a patient, but the doctors requested her to stay at the sanatorium and work, principally because they stated a continuous check should be kept on her condition. Her tuberculosis was called a retarded case. On June 9, 1953, while she was still at the sanatorium, she started this divorce action. In June of 1955 she resigned from her position at Oakdale and came to Fort Dodge and thereafter lived with her sister and brother-in-law. In February 1956 she started working as a machine operator at $1 an hour for a 40-hour week. The trial of this case was commenced on May 28, 1956, and the decree of the court was rendered on June 4.

Plaintiff's principal complaint against defendant was extreme profanity and slanderous statements. The profanity was not particularly directed at her, but was composed of statements to her concerning other people. Plaintiff was interested in church and defendant was a member. However, he continually used extreme profanity toward the minister of the church, the minister's family and the church itself. He often used profanity in her presence toward her Uncle Carl, who had been kind to him and secured a job for him. In addition to profanity toward her uncle he wrongfully accused him of stealing. He wrongfully made charges against her Cousin Clara, claiming she was guilty

of unseemly acts. He continually debased her Aunt Frankie, who was greatly interested in farm bureau affairs, and wrongfully accused her aunt of improper relations. In June 1948 when she was sent to Oakdale she was very sick. The hopes for her recovery were slight. In fact, after she was discharged, the doctors called her recovery a "miracle" cure. In other words, *after she left defendant* and came to the sanatorium and received the standard treatment, her condition gradually improved until July 1952 when she was discharged as a patient. During her period in the sanatorium defendant came to visit plaintiff. The first year he came about once a month. After that less frequently. When he came to visit, his habit of profanity persisted. During his visits his profanity was directed at the sanatorium, the doctors, the nurses and particularly a Jewish doctor who had come from Germany and concerning whom he made the statement to plaintiff that Hitler should have killed him. Plaintiff testified that there was no basis for such accusations because she was receiving proper and careful treatment at the sana-torium at all times. One time when he visited her, and she was better, he took her and her sister and brother-in-law to Iowa City for a little trip. They were walking along a public street in Iowa City when he again started his profanity. He spoke loudly and there were people on the street and she became greatly embarrassed, very nervous and started to cry. Almost every time he visited the sanatorium he would leave her in such an extremely nervous condition that it would take several days and sometimes weeks of administration of nerve medicine to calm her condition. In the summer of 1951 on one of his visits to the hospital she told him she had decided she was going to get a divorce. He became extremely angry and threatened to kill both of them. When the parties were first married plaintiff wanted children, but defendant refused to have any children. Then in the summer of 1948, after her severe tubercular condition had been discovered by the doctors, he insisted on having children, but the doctors stated to her it would be unwise and detrimental to her health. The parties never lived together after June of 1948, when she was sent to Oakdale. Defendant's course of treatment, not only during the three years they lived

together but during his visits to her at the sanatorium, was such that when she resigned in June 1955 she moved to the home of her sister in Fort Dodge and not to her own home in Dayton.

In the large number of divorce cases appealed to this court there are no two state of facts alike. Each action must rest on the facts appearing in that specific case. This case primarily turns upon questions of fact. The evidence is in sharp conflict between plaintiff and defendant. Precedents are not of too great value except as they decide broad and general principles. There are so many facets of human relationship involved in divorce cases that it becomes necessary for us to analyze from many angles what constitutes inhuman treatment.

Plaintiff has the burden of establishing the allegations of her petition by a preponderance of the evidence. Murray v. Murray, 244 Iowa 548, 57 N.W.2d 234; Record v. Record, 244 Iowa 743, 57 N.W.2d 911; Wilson v. Wilson, 246 Iowa 792, 68 N.W.2d 904. Plaintiff's corroboration consisted of the testimony of her sister, Neva M. Manusos, and her brother-in-law, John J. Manusos. The sister's testimony covered generally the period of the married life, but was largely confined to the occasions when defendant visited plaintiff at Oakdale. The testimony of the brother-in-law was also largely confined to the Oakdale visits. The testimony of the corroborating witnesses did not cover all acts of inhuman treatment. Many occasions were necessarily in the privacy of the home. We have held every act of inhuman treatment does not need to be corroborated, provided there is corroboration of sufficient acts to maintain plaintiff's preponderance of the evidence as to the presence of inhuman acts. Courtney v. Courtney, 214 Iowa 721, 243 N.W. 510; Davis v. Davis, 228 Iowa 764, 292 N.W. 804; Low v. Low, 232 Iowa 1114, 7 N.W.2d 367; Littleton v. Littleton, 233 Iowa 1020, 10 N.W.2d 57; Brannen v. Brannen, 237 Iowa 188, 21 N.W.2d 459; Ernest v. Ernest, 243 Iowa 1249, 55 N.W.2d 192; Levis v. Levis, 243 Iowa 574, 52 N.W.2d 509; Sullivan v. Sullivan, 244 Iowa 838, 52 N.W.2d 910. The sister and brother-in-law corroborated plaintiff as to the profanity of defendant when he came to visit plaintiff at Oakdale and as to the fact that this caused plaintiff extreme nervousness which they said usually lasted for many days after defendant's visit. They

specifically testified concerning the incident on the street in Iowa City. Mr. Manusos testified that he remonstrated with defendant concerning extreme profanity in plaintiff's presence, and defendant's answer was that it was good for her; it put her on edge.

Defendant categorically denied the charges of profanity and in general stated the parties had lived a peaceful and happy married life. He did not specifically deny the unseemly occurrence on the street in Iowa City, nor did he deny the statement of plaintiff that in 1951 he had threatened to kill both of them. The testimony of witnesses for defendant was not very helpful in arriving at the truth in the case. A neighbor, Mr. Blair, testified he had not seen or heard any quarrels or troubles between the parties, with the exception of one incident. Mrs. Brown, mother of defendant, testified she had visited in the home occasionally, and they had visited in her home, and she had never discerned any difficulty between them. Mrs. Meehan, mother of former husband of plaintiff's sister, testified she had never witnessed any difficulty between the parties, but the testimony indicates she had rarely seen them.

This case emphasizes the importance of consideration of the complete record. We have held this is essential. Meyer v. Meyer, 169 Iowa 204, 151 N.W. 74; Murray v. Murray, supra; Kentzelman v. Kentzelman, 245 Iowa 579, 583, 63 N.W.2d 194, 196. In Kentzelman v. Kentzelman, supra, we said: "It is necessary to consider the entire record of their married life and not a few isolated instances." There have been shown, as a part of the record, photostatic copies of ten letters written by plaintiff to defendant in the summer of 1952 from Oakdale. There are many endearing terms in the letters. Upon being questioned concerning them plaintiff said: "They were written after we hadn't been getting along for a year. I wrote that I still loved him because I hadn't made up my mind for a divorce yet. Many people write things they don't mean." These letters were written a year before the divorce case was started. They are not particularly material as evidence against plaintiff when taking into consideration the whole record and the ultimate question of inhuman treatment.

■ We have often held physical violence is not always necessary in order to meet the requirements of the statute. Inman v. Inman, 196 Iowa 845, 195 N.W. 583; Massie v. Massie, 202 Iowa 1311, 210 N.W. 431; Low v. Low, Levis v. Levis, Ernest v. Ernest, and Murray v. Murray, all supra. In this case there is no evidence of physical violence. There is the threat on one occasion by defendant that he would kill both of them. The inhuman treatment consisted of continuous and excessive use of profane and slanderous language throughout the years. Profane and abusive language may, in connection with certain attendant circumstances, constitute a basis for divorce on the statutory ground of inhuman treatment. Massie v. Massie, supra; Dillavou v. Dillavou, 235 Iowa 634, 17 N.W.2d 393; Ernest v. Ernest and Wilson v. Wilson, both supra. In Ernest v. Ernest, supra, we said at page 1256 of 243 Iowa, page 195 of 55 N.W.2d:

"We feel justified in giving consideration to the fact that the defendant was disposed to tell 'off color' stories in the presence of guests that were embarrassing to the plaintiff and affected her nervous system and her health. * * * We also have held that the use of profanity by a husband in the presence of others, along with other shown facts, constitute cruel and inhuman treatment that affected a complainant's health."

In Levis v. Levis, supra, we said at page 580 of 243 Iowa, page 512 of 52 N.W.2d: "This court is committed to the proposition that 'life may be endangered by treatment though it involves no physical violence.' Coulter v. Coulter, 204 Iowa 575, 577, 215 N.W. 619, and authorities cited."

There is an element which is very important in this case. That is the fact that plaintiff was afflicted with tuberculosis. Her condition was serious. Through the almost three years the parties lived together it became gradually worse. Finally to save her life she was sent to the tuberculosis sanatorium at Oakdale, Iowa. The doctors despaired of her recovery at first, but she gradually became better. Because of her weakened condition defendant's actions affected her to a greater extent than they would a strong-and normal person. We have held the illness or frailty of plaintiff may be taken into consideration in arriving

at the answer as to whether or not inhuman treatment was present. Inman v. Inman and Massie v. Massie, both supra. In Massie v. Massie we said at page 1312 of 202 Iowa, page 432 of 210 N.W.: "* * * the use of violent threats toward a cultured, refined woman of *frail health* is treatment sufficiently cruel and inhuman to endanger her life and warrant granting of a divorce". (Emphasis ours.) Four cases cited. The trial court properly found defendant's acts had a much more serious effect upon plaintiff than they would have on a normal person; that since tuberculosis had only been retarded, and could easily become active if subjected to the customary acts of defendant, her life was endangered.

This case is triable de novo. We do not minimize our responsibility of rendering the final decision. However, we are justified in giving consideration to the findings of fact and decision of the able and experienced trial court to whom this case was submitted. The court had the advantage of observing the witnesses and determining by their demeanor, frankness or otherwise, and the plausibility of their stories under existing circumstances, the real truth of the matter. Keller v. Keller, 239 Iowa 687, 31 N.W.2d 343; Levis v. Levis, Massie v. Massie and Wilson v. Wilson, all supra.

In Levis v. Levis, supra, page 578 of 243 Iowa, we said, quoting from Massie v. Massie, 202 Iowa 1311, 1312, 210 N.W. 431, 432: " 'We are disposed to give serious consideration to the decision of the trial court in determining final disposition of the case' on appeal."

For the reasons we have outlined this case is peculiarly susceptible to the principle that the decision of the trial court deserves our careful consideration.

The court held that for plaintiff and defendant to live together as husband and wife would eventually result in recurrence of tuberculosis, and the acts of defendant had been and would be such as to endanger plaintiff's life. On the basis of the complete record we approve this conclusion.

The case is affirmed.—Affirmed.

All JUSTICES concur.