IRENE ALBERHASKY, plaintiff-appellee and cross-appellant, v.
GEORGE J. ALBERHASKY, SR., defendant-appellant.

No. 49689.

(Reported in 97 N.W.2d 914)

JULY 24, 1959.

Swisher & Swisher and Edward L. O'Connor, both of Iowa City, for defendant-appellant.

Messer, Hamilton & Cahill, of Iowa City, for plaintiff-appellee and cross-appellant.

PETERSON, J.—Plaintiff and defendant were married at Kansas City, Missouri, January 21, 1921. They lived together until March 18, 1958, when plaintiff left their home, alleging defendant was guilty of such inhuman treatment as to endanger her life. Plaintiff is now 60, defendant 63. During the course of their married life, by hard work and diligence on the part of both parties, they accumulated property worth conservatively $200,000. Petition for divorce was filed March 19, 1958. In addition to divorce plaintiff prayed for equitable division of the property, alimony, and attorney fees. Defendant filed cross-petition, also praying for divorce and alleging sole ownership of all property. The trial court granted plaintiff a divorce and divided the property approximately evenly between the two parties. Both parties have appealed.

Appellant alleges the court committed four errors: 1) The evidence was insufficient to establish a basis for divorce in favor of plaintiff, 2) divorce should have been granted to defendant on his cross-petition, 3) the division of the property and fixing of alimony between the parties was inequitable, and 4) in reducing the allegedly agreed salary of Tom Alberhasky as general manager of a trailer court owned by the parties from $12,000 to $9000 per year.

Appellee alleges on her cross-appeal that the court committed two errors: 1) In making Tom Alberhasky any allowance as manager, 2) in failing to fix attorney fees against defendant in favor of plaintiff's attorneys.

I. From the standpoint of the material matters of life the story of the parties to this action, and of this family, is a success story. However, from the angle of what is more important, a happy family life as between plaintiff, defendant and their five fine children, it falls far short of being successful.

Shortly after marriage the parties moved to Iowa City. In 1927 they purchased a tract of approximately 30 acres located a short distance north of Iowa City, on the highway which is now No. 218. The contract of purchase was made in the name of both parties as owners in common. It was purchased on the basis of $500 cash and annual payments. The price was $7000. Some years later, when it was paid for, the deed was executed to both plaintiff and defendant.

Shortly after moving into the country defendant purchased a one-half interest in a restaurant in town and devoted most of his time to the maintenance of the restaurant. Plaintiff did the work on the farm, in addition to her housework and the rearing of the children. She raised about 500 chickens a year, and dressed them for sale in the restaurant. She milked the cows and cared for the hogs. She had a large garden in which she raised vegetables and when the boys became old enough they peddled the vegetables in the city. After a year or two defendant sold his interest in the restaurant and established a retail butcher shop on the farm. She helped him with this work in keeping the butcher shop clean, rendering the lard and again dressing chickens, geese, and, at holiday time, turkeys, for sale in the butcher shop.

The parties were the parents of two boys and three girls: Joe, Thomas, Bernadette (now Mrs. Dyer), Frances (now Mrs. Cayer), and Audrey. The children are all adults, Audrey being the youngest and being twenty-two years of age.

Sometime before World War II defendant closed out his butcher shop. He had been doing cement work through the years and was somewhat skilled in that work. He left in 1942 to do this type of work in the building of camps in various parts of the country. Most of the time he worked in California. He earned good wages and after deducting a sufficient amount to maintain himself he sent the remainder home each week to his wife for the expenses of the family. He met a woman in California by the name of Mrs. Gladys Clay and became unduly interested in her.

When he returned after the war his habits and mode of life had changed. He became irritable toward plaintiff and on the least provocation would become extremely enraged. He used profanity continuously toward plaintiff and in the presence of the children. On one occasion he became so enraged that he doubled up his fist and was going to strike plaintiff, but fortunately she dodged the blow. Sometime after his return from California Mrs. Clay moved to Iowa City. Three witnesses testified as to his car being parked often in front of her apartment and also that he took her out for rides in the evening.

In 1948 they established the first section of a trailer court on the farm. At that time they purchased an additional tract of about seven acres at $800 per acre. The title to this tract was also placed in both plaintiff and defendant. This deed was a joint tenancy deed. Because of the divorce, the joint tenancy provision of the deed is hereby canceled and the ownership shall stand in the two parties as owners in common. The name of the trailer court is Forest View Trailer Court.

At the time of the purchase of the last tract the parties borrowed $10,250 on the 37 acres. Part of the money was used to pay for the seven acres and the balance was used in establishing the first unit of the trailer court. During the intervening years the trailer court has been enlarged, from receipts or from money still owing, to where there are now 289 locations for trailers.

Sewer, water, and electricity has been installed for all trailers. A building, with laundry, toilet and shower facilities, has been erected.

In connection with this business plaintiff has been as active as defendant. For the first few years a trailer court office was maintained in the home and plaintiff would serve the trailer owners as they came to rent locations; would place them in their locations and give them receipts for the rent paid. She was, in fact, on duty twenty-four hours a day because customers would come at all hours of the day and often at night. A separate building, as an office, has now been erected.

In addition to the constant use of profanity by defendant toward plaintiff the following is a sample of the language used whenever he would become enraged about any question raised or suggestion made by plaintiff: " 'You G.... d.... ungrateful crumb, you're not telling me how to run this business, I'll do it the way I want to, and you stay out of that park. * * * I'll tell you, you old bitch, it's none of your business.' " The use of the word "bitch" by him toward plaintiff became a common expression. The above quotations are from the testimony of plaintiff. Three of the children, Joe, Frances and Audrey, testified in corroboration of the allegations made by plaintiff. One son Tom testified on behalf of defendant, but he only testified as to property and financial matters; he offered no testimony as to the differences between the parents.

Joe testified: "I heard my father cursing and using abusive language toward my mother. * * * I heard him call her names as 'you lazy old bitch.' I have heard him say that many times." The daughter Frances testified: "He cursed my mother and called her an old bitch, and I said, 'Dad, can I have an explanation, what about this other woman, Gladys Clay?' He raised his fist in my face and said: 'It's nobody's G.... d.... business.' * * * He said it was his own life and nobody's G.... d.... business." Audrey testified: "My father was given to profanity, he cursed all of the time. * * * If mother made a suggestion it was, 'you crazy old bitch. You don't know what you are talking about,' * * * and that's just part of it. These statements were made quite often, maybe every week, everyday,

sometimes three times a week, any time she made a suggestion. I don't remember my father ever spending one evening at home."

The children knew about his affair with Gladys Clay, but until March 18, 1958, they had never told their mother about it. She had some suspicions, but no definite information. A discussion had arisen between plaintiff and defendant in which he said he was going to make a will and while the statements are not too clear, because it was largely an angry discussion, the purport of his statements was to the effect that he was going to appoint two of the children as executors. She discussed the matter with her son Joe and for the first time he told her definitely about defendant's affair and association through many years with Gladys Clay. After thirty-seven years of married life, and in addition to his treatment of her in recent years, this blow was too heavy for her. She moved out, and next day she filed this divorce action.

According to statute, in addition to the inhuman treatment, there must also be danger to the life of the spouse making the accusations. The best description of the effect on plaintiff of defendant's treatment, and the sudden shock of her discovery that he had carried on an affair for years with another woman, is described in the testimony of the son Joe in which he said:

"I have noticed the effect of my father's treatment on my mother. Mom would cry sometimes because of the way that he acted and everything and I had even wondered if she was going to have a nervous breakdown, because I didn't think she could take much more of it. She just couldn't go on. Since she left out there on March 18th, she has stayed at the Burkley Hotel. She comes to my house for a good many of her meals. In recent weeks, she has been staying at our house, Allie's and my home. Since she has been away from my father, I have noticed that she is very much better. She is not nervous like she was and very cheerful, and she is just a different woman. * * * My mother would not be safe living with that man again. Her life would definitely be in danger."

In defendant's testimony he did not deny any of the testimony by his wife and children as to his profanity, abusive language and association with Gladys Clay.

Appellant's counsel contend that the profanity and verbal abuse by defendant was not sufficient to disturb her, because it was a part of quarrels between the parties, and she returned the language and statements in kind. As to this matter the son Joe testified: "I do not recall hearing my mother use bad language. I don't believe that I can say that I have heard my mother use some profane language in the presence of my father."

■ We have held in numerous cases that inhuman treatment sufficient to endanger life can be present even in the absence of physical violence. We will cite only one older case because we desire to quote from same; otherwise we will cite a few recent cases in which this theory has been sustained: Thompson v. Thompson, 186 Iowa 1066, 173 N.W. 55, 5 A. L. R. 710; Murray v. Murray, 244 Iowa 548, 57 N.W.2d 234; Brown v. Brown, 248 Iowa 802, 82 N.W.2d 661; Joneson v. Joneson, 249 Iowa 343, 86 N.W.2d 877; Bouska v. Bouska, 249 Iowa 281, 86 N.W.2d 884; Carpenter v. Carpenter, 248 Iowa 202, 80 N.W.2d 323; Wilson v. Wilson, 246 Iowa 792, 68 N.W.2d 904; Hylarides v. Hylarides, 247 Iowa 841, 76 N.W.2d 779; Ernest v. Ernest, 243 Iowa 1249, 55 N.W.2d 192; Doyle v. Doyle, 241 Iowa 1185, 44 N.W.2d 761.

We will quote from Thompson v. Thompson, supra (at pages 1067, 1068 and 1069), because the language used is apropos as to cases of this nature and particularly as to the case at bar:

"This statute does not mean that divorce from the bonds of matrimony may be decreed only when it is shown that the husband has been guilty of some act of physical violence to the wife which in and of itself endangers her life. It does not mean that the complaining wife, before she is entitled to invoke this provision of the statute and obtain the relief which it affords, must be able to show that the husband was guilty of some physical violence which, operating upon her person, had, in and of itself, a tendency to endanger her life. * * * Life may be endangered by treatment though it involves no physical violence. It takes more than the physical body to make up the entity known as a human being. The mind can grasp the possibility of inhuman treatment that does not endanger life. Whether it does or not depends, not only upon the physical, but upon the

moral, mental, or spiritual quality of the one made subject to the treatment. Some people are stoical and indifferent, in a degree, to certain kinds of treatment. To others, more sensitive and delicate in their organization, the treatment is intolerable, weighs heavily upon the heart, and preys upon the mind. This, reacting upon the body, endangers the life of the body. As some poet has said: 'Killed by unutterable unkindness, worse than a life of blows.' * * * The relationship between husband and wife is very close. Each rightfully looks to and depends upon the other for companionship of heart and mind, and each is pledged .to the other to bring into the home life that sunshine which gives warmth and comfort and happiness. * * *

"During the years that intervened between the marriage of this plaintiff and the defendant, dark clouds had slowly enveloped her life. She was subject to curses, suspicion, and neglect. These produced mental disturbances, heart sickness, and unhappiness. These, reacting, had a natural tendency to imperil her life."

The treatment of plaintiff by defendant constitutes inhuman treatment sufficient to endanger her life and the granting of the divorce to her by the trial court is sustained by the evidence and supported by many previous decisions of this court.

II. Defendant contends he is entitled to a divorce on his cross-petition on ground of inhuman treatment endangering his life. He proffered no evidence in support of his contention. His only complaint against defendant was failure as to marital relations for some years past.

Defendant's counsel places great emphasis on the absence of marital relations. Defendant claims such absence was for 20 years, but the testimony indicates this hardly seems probable. However, it may be true as to the last few years since he returned home after the war in 1946. It is not surprising, for during that time he was so mean and abusive toward plaintiff that conditions were not conducive to marital relations. Furthermore during all those years defendant had what he called "another woman" and that may have had some significance. As early as 1947 he said to his sons Joe and Tom: " 'Boys, I have got another woman. Do you want me to leave?' " Joe said:

".'No, Dad, we don't want you to leave.' I wouldn't want to lose my dad because I think a lot of him, and I was beat. I put my arm around him and I said, 'Man, let's not talk about this any more.'" There is no direct evidence of adultery, but there is evidence of his driving to her apartment, and of constant association for many years, starting in California and continuing after she followed him back to Iowa City.

In fact, outside of defendant's contentions about owning the property, his testimony about plaintiff was commendatory. He testified:

"All of this time that I was working in this restaurant and butcher shop Mrs. Alberhasky gave birth to three children and there was a lapse of seven years and she had the two little girls. She had five babies during that time. She went right along working with me and doing the housework and helping outside even when she was pregnant with the babies. My wife worked and devoted her time to get along the same as I did and try to make a living. * * * my wife was doing the washings and ironings and scrubbings. When I was in the restaurant business she helped in raising and cleaning chickens which were used in the restaurant. On several occasions she helped to clean chickens and geese and ducks when I was in the butcher shop."

Dismissal of defendant's cross-petition by the trial court is approved.

III. Plaintiff claims she is the owner of an undivided one-half interest in all the property. Defendant claims he is the owner of all the property, and that he only had the name of plaintiff included in the deeds as a matter of courtesy. This contention of defendant is not supported by the record, for two reasons:

1. Plaintiff contributed one half of cost of the farm from money earned or secured by her outside of her regular household and homemaker activities. The 30-acre tract was purchased under contract in 1927 for $7000. Parties also bought some machinery and some other personal property from the owner at a cost of $500. The record is without contradiction that plaintiff made the following contributions to the expenses of the home which include the annual payments on the 30-acre tract. For a year she rendered domestic services for a family in Iowa

City. She did baby sitting and cleaning in a home in town for several years. This brought substantial resources into the home.

She cared for an aged uncle, who was feeble and helpless, for more than a year. Defendant suggested she take him and care for him. The uncle paid her $1500 which went into the family exchequer. Her sister loaned defendant $1000. When he asked the sister about repayment she told him to give it to his wife. It was not turned over to the wife, but was used in connection with home obligations, including paying for the farm. She raised and sold chickens and vegetables as heretofore shown. She had an inheritance from her uncle which was used in the home. There is conflict as to the amount, but the exhibits indicate she received $962.82.

Taking into consideration all the above contributions made by plaintiff through her personal and individual efforts there is no question but what she paid just as much on the $7500 and interest as defendant paid from his efforts.

2. In 1927 when the 30-acre tract was purchased and in 1948 when the seven-acre tract was purchased, and when the trailer court was started, the projects were created as a joint venture by plaintiff and defendant. There was no contention, and there was no thought on the part of either party, in those earlier days but what they were joint owners and operators of everything. Defendant's contention that her name was placed in the deeds only as a matter of courtesy is a fiction which was never heard of or expressed before the divorce action. Defendant does not support this contention with any evidence.

The second tract of about seven acres was purchased in 1948 for $800 per acre. Neither party has as yet paid anything on the purchase price of this tract. When the purchase was made and deed executed to both parties as grantees the parties arranged for a loan of $10,250. Both parties executed a mortgage on the total acreage to secure the loan. In April 1958 defendant wanted to pay off the mortgage and get it released on the records. He borrowed the money from his son Tom and on April 24, 1958, gave him a promissory note for the same amount payable one year after date. This note is still outstanding and will have to be paid to Tom with interest either from money on hand or when the trailer court is sold.

The trailer court occupies about 24 acres of the farm. The balance is occupied by some houses the parties built, or is used for farming and pasturage purposes. In concluding what plaintiff should reasonably and equitably have from defendant as alimony, we start with the premise that she is already the owner of an undivided one-half interest in all the property.

IV. A brief analysis of the testimony as to value of the property, and the income and disbursement situation of the trailer court in recent years, will be helpful in arriving at the equities of the case as to division of property and alimony.

The property is strategically located for this business; near a University town with continuous opportunity for good customers. Both parties offered some testimony as to the value of the trailer court. Each trailer spot rented for $20 per month with the exception of about a half dozen, where the tenants had been there for many years and which spots were on a rental basis of $18.50 per month.

Mr. Samuel B. Whiting, who had been a realtor in Iowa City for twenty-three years, testified that the fair and reasonable market value of the trailer court was $1100 per unit or approximately $330,000. He valued the wells, home, some vacant lots, an old house, and the undeveloped 10 acres at $30,200.

Joe Alberhasky, son of the parties, testified he had made investigation and inquiry relative to the value of trailer courts. On the basis of such inquiry he placed the value at $1500 per trailer spot. He also testified that in conversations with his father before the filing of this action his father had placed the value at between $1000 and $1500 per spot.

The Iowa Highway Commission held a hearing at Iowa City with reference to the interstate highway. The proposed route traverses the trailer court, running almost through the center of same, with a width of 300 feet. Defendant filed a statement at the hearing in which he alleged that the damage to the court by running the interstate highway through it would be $375,000.

Mr. R. P. White, a realtor, testified for defendant. He said he had no experience with reference to trailer courts and could not place a value on same on that basis, but if the farm was to

be subdivided for sale of acreages it would be worth $1000 per acre.

Defendant testified as to value, and placed the value of all the property at $35,000, which, of course, was a ridiculous appraisal, in view of his previous statements.

The value placed by the trial court of $10,000 on the homestead allotted to plaintiff and $200,000 on all of the balance of the property, real and personal, is a conservative and reasonable valuation.

The books were kept, and income tax returns for the court were made, for at least the last two or three years, by Clemence Accounting Company. Copies of the income tax reports for 1955, 1956 and 1957 were offered in evidence. The receipts and expenditures show the rapid growth and development of the business, as trailer spots were increased from year to year. In 1955 the gross income was $24,008.25. The expenses and depreciation were $13,006.51, leaving a net profit before taxes of $11,001.74. It is worthy of note that for that year there were no disbursements for salaries or wages. In other words, plaintiff and defendant did all the work of the management and care of the court. In 1956 the income was $45,949.03. The disbursements and depreciation were $27,172.27, leaving a net profit for the year before taxes of $17,926.76. The expense of salaries and wages for that year was $3150. Plaintiff and defendant were still doing most of the work. The gross income for 1957 was $56,507.30. Expenses and depreciation amounted to $35,-973.36, leaving a net profit before taxes of $20,533.94. Labor, salary and wages had increased to $12,457.85. However, of this amount $3741.56 was for labor in connection with preparing a large number of additional trailer spots.

Mr. Arthur Clemence testified concerning the income for 1958 up to September 1. The gross income for the eight months was $64,258.05. The expenditures were $49,296.63. This leaves a net income before taxes of $14,961.42. Included in the expenditures were $9917.40 paid to defendant, and $2000 paid to Tom. These will not be recurring items for the future.

When the divorce action was started plaintiff secured an attachment against all the property, including the bank account. At that time there was $10,364.81 in the bank under the name

of Forest View Trailer Court. Nine hundred dollars has been withdrawn to pay alimony, etc. This is the sole obligation of defendant. A new account was then opened for the business, which account was placed in another bank under the name of Tom Alberhasky Trust Account. The principal trial of the case started on September 16, 1958, and continued for several days. Both parties rested. Sometime thereafter application was made by defendant to reopen the case for the purpose of offering more testimony. Order of court was entered granting the application. Further evidence was taken on October 2 and October 23. Tom testified on October 23 that there was a balance in his account for the trailer court on that date of $3101.93.

In 1957 Mr. and Mrs. Alberhasky incorporated the Forest View Trailer Court. In the Articles of Incorporation defendant was named as president and treasurer. Plaintiff was named vice-president and secretary. The parties did not start to operate as a corporation immediately. No stock was issued; no property was ever transferred to the corporation; no minutes were ever kept and outside of the provision in the Articles of Incorporation no officers were ever elected. It was in fact an empty shell. The reason for the incorporation was that the city of Iowa City would not make arrangement with individuals for connection with its sewer system. The agreement had to be made with a corporate entity. In 1958 defendant and his son Tom, for some reason, started the use of the corporate name. No bank account was opened under such name. It is not too material because plaintiff and defendant own whatever the corporation means, in equal shares.

For the first six months of 1958 defendant drew from trailer court receipts the sum of $1000 per month. In July he drew $267.40. He claimed this was paid to him as an officer of the corporation. He performed little service for the trailer court during that period. He had a serious operation and was in the hospital for a considerable length of time in May of 1958. ██ ██ In addition to withdrawal of said amount he also collected from the trailer court the sum of $3650 which he called rent. This was a total of $9917.40. The trial court permitted defendant to keep this amount on the theory that this was in the nature of an offset against plaintiff becoming the owner of

the home of the parties. We are approving it for this and an additional reason—plaintiff's counsel did not raise any question about the item as an error or in the form of a proposition. Under the rules, and also by decisions of this court, this constitutes a waiver. Rule 344(a)(4)(Third), Rules of Civil Procedure, states: "Errors or propositions not stated or argued shall be deemed waived." Somewhat in point also are many precedents that a party may not have a more favorable decision in this court without raising the question on appeal. Robbins v. Beatty, 246 Iowa 80, 93, 67 N.W.2d 12, 19, and citations.

V. One of the errors alleged by defendant is that the court should not cut Tom's salary from $1000 to $750 per month. Defendant hired his son Tom as manager of the trailer court at $1000 per month. This dated back to a time prior to the commencement of the divorce action. There is conflict in the evidence as to whether or not plaintiff agreed to the arrangement. Defendant testified plaintiff agreed. Plaintiff denied she ever agreed, or that defendant talked to her about it. The evidence of the son Tom with reference to the matter was as follows:

"I talked to my mother and told her that my father had talked to me about acting as manager of the trailer court. My mother asked me what I thought would be a fair salary. I told her that I thought it was up to her and my father to determine what the salary would be. My mother said, 'Well, what do you think is a fair salary?' That was said at their home. I turned and walked out the door without ever saying what I thought the fair salary would be."

On questioning by the court, after the case was reopened and a second hearing took place, Tom testified as follows:

"It was my father that fixed the amount of $1000 a month. My mother was not present. If the Court ratifies the agreement it would mean $12,000 up to September 1st of this year. Of this I have already received $2000. I would have an unpaid balance of $10,000 up to September 1st of this year. * * *"

The Court: "Q. Well, I believe you stated awhile ago you have no lien for the $10,000 note, you have no lien for the $7800 note or 7900, whatever it is. It ought to be worth something to you, hadn't it, if this Court fixes it as a charge against all that property out there? A. It's a difficult answer for me to give. If

you set the amount—I wouldn't hurt either party, there would be nothing on my part to hurt either one for what I have done. It would be all right just to leave it up to you. Whatever you decide. That would be all right. It puts me in a difficult spot. I have earned the money. It is not a gift. I have earned it as wages. I can show you what I have accomplished and what I have done for that amount of money. It is a difficult thing for me to say after I have earned it to take anything else than what I have already entered into the agreement with them to do the work for. I don't see what good it would do to discuss it any more with my father's attorneys."

The court reduced Tom's salary from $1000 to $750 per month. Tom was claiming $13,500 to October 15, 1958, less $2000 paid to him.

From careful consideration of the record it appears that most of the work in connection with the supervision and management of the trailer court was done by Mr. Gene Dyer, the son-in-law of the parties. He lived in a house on the farm adjoining the trailer court. He was there 24 hours each day and did all the work of renting the trailer spots, collecting the rent and supervising everything in connection with the trailer-court project. His salary was $125 per week, which was fair and equitable in view of all the services and supervision he was doing.

The trial court cut Tom's balance of $11,500 twenty-five per cent. *As far as plaintiff is concerned,* we hold there should be a further cut in any item claimed by Tom. We have no authority in this divorce action to decide as to any agreement between defendant and Tom. If they have made an agreement which defendant desires to carry out in the future when the trailer-court property is sold, that is a matter between them and is not under the jurisdiction of this court in this case.

After commencement of the case plaintiff had no opportunity to control her property interest, and she should be protected in this case as against any unwarranted and unreasonable charges in connection with property of which she was the one-half owner. From her testimony and from Tom's testimony, as set out above, it does not appear that she agreed to any such charge for Tom's management. From all the testimony offered we fail to find any services rendered by him which would justify

either the amount claimed or the amount fixed by the trial court. Except when called, or when there were some emergency repairs to be made, he was not on duty at the court. It is true he had some machinery of the Tom Alberhasky Contracting Company on the premises and this machinery did some work at times. He has a bill on file for work performed in 1955 and 1956 of $7208.57. He received a note for this. He has a bill on file of $796.77 for work performed by his workmen in 1957 and 1958. He testified he was called out to the court about fifty times during the period involved. This was less than once a week. He himself did no work, he ordered and supervised what had to be done.

He performed one other service. After the commencement of the divorce case, and the trailer-court account in the bank was attached, he opened up a new account in another bank and all receipts and expenditures as to the trailer court were thereafter deposited in and paid out of that account. Mr. Dyer collected the money and prepared it for deposit and Tom took it to the bank and deposited it.

He has already collected $2000 for his services, and, as far as plaintiff is concerned, another $2000 will pay him for all personal services rendered by him from the time his father hired him to date.

VI. As to property division and alimony decision, divorce cases are peculiarly dependent on the facts of each case. Specific rules are not too helpful because the facts vary from case to case. The elements to be considered are parties' age, health, present ability to earn, amount of resources owned by each or both parties, contributions of each to the joint accumulations, the duration of the marriage, indebtedness of each or both, conduct of the guilty party, and any other facts which assist the court to arrive at a just, fair and equitable decision. Retman v. Retman (Iowa, N.O.R.), 254 N.W. 804; Mitchell v. Mitchell, 193 Iowa 153, 185 N.W. 62; Brannen v. Brannen, 237 Iowa 188, 21 N.W.2d 459.

We approve the decision of the court with reference to the two important matters concerning property, which is the granting of the residence to plaintiff and the equal division of

the remainder of the property. We will modify as to some other matters decided by the trial court. The property and alimony situation is hereby decided as follows:

1) Plaintiff shall be the absolute owner of the home residence of the parties. She now owns one half, and defendant's one half is allocated to her. It is described in the decree. Plaintiff shall have possession of the residence immediately after filing of the procedendo. She shall also be the owner of all household goods and personal effects contained in the home, with the exception of any personal clothing or personal items of defendant.

2) The ownership of all other property, including the trailer court, the farm, and all personal property of every nature, kind and description on the farm or trailer court be and is hereby established as one half the property of plaintiff and one half the property of defendant.

3) Defendant shall be the absolute owner of the Chrysler automobile now registered in his name.

4) Each of the parties shall be the owner of an undivided one-half interest in the two bank accounts which as of October 23, 1958, amounted to $14,014.81. If the Tom Alberhasky bank account as to the trailer court has been enhanced to a larger amount since October 23, 1958, one half of said additional amount shall be the property of each of the parties hereto. This is subject to the debts of the trailer court as we will hereinafter outline.

5) If, since October 23, 1958, Tom Alberhasky has collected anything from the trailer-court receipts for any personal services as manager in excess of the additional $2000 heretofore allocated to him, such amount shall be credited on his notes and open account against the trailer court.

6) We modify the monthly alimony fixed by the trial court in favor of plaintiff and against defendant. In view of the property division and the fact that plaintiff is to have the homestead in which to live for the remainder of her life, or to sell if she desires, the monthly alimony fixed by the trial court is inequitable. We provide that from the filing of the procedendo herein until the real estate owned by the parties jointly is sold in the partition action, and proceeds distributed, defendant shall pay to plaintiff the sum of $200 per month alimony. After she

has secured her share of the proceeds of sale he shall pay $100 per month until one or the other of the parties depart this life, or if plaintiff should remarry, until she is remarried.

7) One fourth of the costs of this appeal shall be taxed to plaintiff; three fourths to defendant. Defendant shall pay to plaintiff's attorneys additional attorney fees of $550. Under order of court they have previously received $950.

VII. A partition action is pending between the parties which disposes of the question of sale of the property.

When the referee in the partition action has made sale of all property, any unpaid amount of the following debts is established as a lien against the proceeds in his hands, and after payment of costs, expenses and fees of the partition action the following debts established by the decree of the trial court shall first be paid:

1) Thomas Alberhasky's note dated April 24, 1958, in the amount of $10,250, together with interest at five per cent per annum until paid; 2) Thomas Alberhasky's note for work of his company rendered to the Forest View Trailer Court dated December 12, 1956, in the amount of $7208.57, together with interest at five per cent until paid; 3) Thomas Alberhasky's open account for work rendered to the trailer court in the amount of $796.77; 4) Thomas Alberhasky's balance of salary in the amount of $2000 unless same has been paid since October 23, 1958; 5) Carrie Kearns' note in the amount of $600 and interest dated January 1, 1951, but on which interest has been paid to January 1, 1958; 6) Younkers' store account of $245.45, unless same has been paid since October 23, 1958; 7) miscellaneous small bills in the amount of $450 unless same have been paid since October 23, 1958; and 8) any other outstanding bills as against the trailer court and unpaid at date of sale. Cash on hand October 23, 1958, of $14,014.81, and any other cash accumulated, should be used to pay debts as far as it will reach. After payment of all such items the balance of the proceeds of the sales shall be equally divided between plaintiff and defendant.

Until sale in the partition action plaintiff will have no voice in the management of the trailer court. For the protection of her property rights as established herein, it is necessary that we make some provisions concerning the maintenance of the valu-

able Forest View Trailer Court business until the property is sold and distribution made. As far as plaintiff is concerned Tom Alberhasky shall not be on the pay roll as manager. If defendant wants his help on a salary, it will be at his expense. If services of his construction company are needed, same shall be paid for as it has been during recent years. The record clearly shows the business can be successfully conducted largely under the management and supervision of Mr. Dyer. He will need help in the form of labor to keep the court clean and to care for the laundry room, shower room and toilet facilities. He will need the accounting and bookkeeping service of Clemence Accounting Company to care for all bookkeeping, income tax returns and federal and state reports, all of which is authorized.

If defendant's health is such that he can co-operate with Mr. Dyer in the supervision and maintenance of the business he is authorized to do so for the benefit of both parties. His salary for such services shall not be in excess of $500 per month as far as plaintiff's share of same is concerned. He shall only draw salary for services performed, not as an officer or for rent.

Clemence Accounting Company shall provide plaintiff with a monthly account of all receipts and disbursements. Each three months a division of net profits shall be made, one half to plaintiff and one half to defendant if there are any profits to divide. If any delinquencies or questions arise as to supervision and management of the trailer court until sale of the property, same may be submitted to the trial court on application therefor, and upon hearing the trial court shall enter order consistent with the provisions herein.

The decree of the trial court is affirmed, subject to the modifications as outlined. One fourth of the costs of appeal is to be taxed to plaintiff; three fourths to defendant.—Modified and affirmed.

All JUSTICES concur.